UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| IN RE. NASH ENGINEERING CO. | : : : : : : : : | CIVIL CASE NO. 3:25-CV-00055 (JCH) <br><br> SEPTEMBER 25, 2025 |

**RULING ON MOTION TO APPROVE COMPROMISE WITH CENTURY INDEMNITY COMPANY AND PACIFIC EMPLOYERS' INSURANCE COMPANY (DOC. NO. 26)**

**I.    INTRODUCTION**

George I. Roumeliotis, the Chapter 7 Trustee ("Trustee") of the Bankruptcy Estate of the Nash Engineering Company ("Nash"), submitted a Motion to Approve Compromise with Century Indemnity Company and Pacific Employers Insurance Company, dated January 3, 2025. ("Mot. to Approve") (Doc. No. 26).  G. Denver and Co., LLC ("Denver") filed an objection on March 21, 2025. ("Denver Objection") (Doc. No. 39).  The United States Trustee ("UST") filed a similar objection on March 13, 2025. ("UST Objection") (Doc. No. 30).  The Trustee then entered into a modification of the Settlement Stipulation ("Amended Settlement Stipulation") (Doc. No. 43).  The Trustee then filed a reply to further support the Motion to Approve and address the objections raised.  Trustee Reply (Doc. No. 44).  The Trustee also filed a Revised Proposed Order in order to correct the objections.  Revised Proposal (Doc. No. 46).

For the reasons stated below, the court adopts the Motion to Approve as addressed by the Revised Proposal, and the court overrules Denver's objections.

1

## II.     BACKGROUND

On October 19, 2021, Nash filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code, and the Trustee was appointed the next day to administer the Estate. Mot. to Approve at ¶ 1.  Nash, founded in 1905, manufactured pumps for various industries; some of these products contained asbestos.  Id. at ¶ 2.  Exposure to asbestos can result in various illnesses, including lung disease, mesothelioma, and cancer.  Id.  In 2002-2004, Nash, sold its manufacturing operations, but continues to remain potentially liable for personal injury and wrongful death claims related to the asbestos.  Id.  Nash has been named a defendant in over 8,000 lawsuits.  Id. at ¶ 3. The automatic stay under section 362 of the Bankruptcy Code has stayed existing litigation against Nash and barred the filing of new cases.  Id.  There will be further notice and an opportunity to file claims before any distribution to creditors is made.  Id. The Trustee's goal is to provide holders of Asbestos Personal Injury Claims an earlier and more substantial recovery through the Chapter 7 system than would have been practicable within the tort system.  Id.

In the 1970's and 1980's, Century Indemnity Company's predecessor, California Union Insurance Company, and Pacific Employers Insurance Company (the "Insurers"), issued Nash four excess liability insurance policies with aggregate indemnity limits of $50 million (the "Policies").  Id. at ¶ 4.  The periods and amounts covered by these policies represented a small portion of Nash's overall liability for asbestos related claims.  Id.  Through 2019, another Nash insurance carrier assumed principal responsibility for defending and indemnifying the Asbestos Personal Injury Claims; that carrier asserted its coverage would be exhausted in 2019.  Id. at ¶ 5.  Nash turned to

the Insurers for coverage under the Policies.  Id.  The Insurers asserted numerous bases for limitation or outright denial of any coverage under said Policies.  Id.

However, around October 31, 2019, Nash and the Insurers agreed to an interim funding arrangement under which the Insurers would defend and indemnify Nash for Asbestos Personal Injury Claims up to $500,000, later increased to $1,350,000, (the "Interim Agreement") as the parties attempted to negotiate a more complete agreement.  Id.  Negotiations between Nash and the Insurers finalized in an agreement executed on April 4, 2020 (the "Insurance Buyback Agreement"), where the Insurers agreed to buy back all of their known and unknown policies in exchange for: (1) committing to pay the next $14.35 million in defense and indemnity costs for the Asbestos Personal Injury Claims, (2) managing the defense of the claims, and (3) additional non-monetary consideration.  Id. at ¶ 6.  The $14.35 million figure included the amounts to be paid under the Interim Agreement.  Id.  As of October 19, 2021, the Insurers had paid approximately $11,425,780 in costs under the Insurance Buyback Agreement, leaving a balance of around $2,924,220 to be still paid for future claims.  Id.  The Insurance Buyback Agreement provided for Nash to file a certificate of dissolution, with the effect of starting the three-year post-dissolution period pursuant to C.G.S. § 33-887, within which claims could be filed against Nash.  Id. at ¶ 7.  Amounts available under the Insurance Buyback Agreement were insufficient to fund Nash's liability and defense cost obligations even during the three year period.  Id.  Faced with imminent depletion of funds, along with disputes with other insurers over additional coverage, Nash began a Chapter 7 proceeding.  Id.

The Bankruptcy Code requires a Chapter 7 Trustee to investigate the debtor's financial affairs and collect the property of the bankruptcy estate. 11 U.S.C. § 701(a)(1),(4). Estate property includes assets turned over by the debtor and claims that the trustee could bring on behalf of the debtor or its creditors. 11 U.S.C. § 541(a)(1),(4). Among these claims are suits to avoid fraudulent transfers. 11 U.S.C. § 544(b)(1), 548(a). An intentional fraudulent transfer is a claim to recover property that the debtor transferred with an actual intent to hinder, delay, or defraud its creditors. Mot. to Approve at ¶ 8., citing 11 U.S.C. § 548(a)(1)(A); C. G. S. § 52-552e(a)(1). A constructive fraudulent transfer is a transfer of property for less than its reasonably equivalent value, made while the debtor was in financial distress. 11 U.S.C. § 548(a)(1)(B); C. G. S. § 52-552f.

The Trustee's investigation included determining if the Estate had a claim to avoid the Insurance Buyback Agreement as a fraudulent transfer, and considering the value of the Policies in relation to the monetary and non-monetary value given to Nash under the Insurance Buyback Agreement. Mot. to Approve at ¶ 9. Valuation of the Policies is complex, involving the terms of coverage, projection of the amount of future liability claims, and allocation of claims. Id. The Trustee relied upon his counsel for the legal analysis and on a financial expert, Ankura Consulting, LLC, for the complex fiscal analysis. Id. The Trustee determined that the Insurers issued four Policies providing coverage for Asbestos Personal Injury Claims. Id. at ¶ 10.[1] Each Policy provided

---

[1] In 1979 and 1980, Century Indemnity Company's predecessor, California Union Insurance Company, issued year-long umbrella/excess policies with annual limits of $5 million. In 1981, California Union Insurance Company issued a year-long umbrella/excess policy with annual limits of $20 million. In 1984, Pacific Employers Insurance Company issued an umbrella/excess policy with limits of $20 million that covered slightly more than a year, for the period of January 1, 1984 through January 7, 1985. Mot. to Compromise at ¶ 10.

4

additional coverage directly over underlying primary policies; this underlying coverage had an aggregate limit of $1 million; which means the Policies would be triggered only after the underlying primary policy limits had been paid.  Id.  Each Policy included coverage for defense outside of the limits of the Policies, which once a Policy was triggered, the Insurers were responsible for defense costs for all covered claims until the Policy was exhausted through payment of indemnity in the full amount of the Policy's limits.  Id.

Once triggered, the Policies' obligations for indemnity and defense costs for any particular Asbestos Personal Injury Claim was limited to the share determined by Connecticut law.  Id. at ¶ 11.  These claims against Nash are "long-latency" claims – claims for injuries not discovered until years after exposure.  Id.  The Connecticut Supreme Court has held that a pro rata allocation must be applied to long latency claims.  Id., citing Security Ins. Co. of Hartford v. Lumbermens Mutual Casualty Co., 264 Conn. 688, 710 (2003).  Under the pro rata methodology, costs of defense and indemnity for each claim must be individually allocated across time from the claimant's date of first exposure to asbestos through the date of discovery or to an earlier date as insurance for asbestos claims were no longer available to Nash.  Id., citing R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co., 171 Conn. App. 61, 118 & 129 (2017), aff'd, 333 Conn. 343 (2019).  If Nash had insurance coverage, then the insurer providing coverage during each period is responsible to pay; absent coverage, whether coverage was available and Nash did not buy it, or Nash lost its coverage, Nash itself is responsible.  Mot. to Approve at ¶ 11.

Ankura determined it had enough information to estimate the value of pending and future claims. Id. at ¶ 12. Ankura estimated that, when Nash struck a deal with the Insurers, the nominal value of all claims was $313,336,646. Id. Ankura allocated each of the claims over time, resulting in the share allocated to the Insurers of $45,605,120; and a net present value of $40,273,273. Id. The gap between the value of the Policies and the amount of $14,350,000 that the Insurers committed to pay under the Insurance Buyback Agreement, provides the basis for the Trustee's position that the Insurers did not reasonably pay equivalent value for the Policies. Id.

The Trustee alleges it uncovered evidence that Nash entered into the Insurance Buyback Agreement with actual intent to hinder, delay, or defraud its asbestos victims, and the Trustee concluded that the Estate could and should assert claims to avoid transfer of the Policies to the Insurers under the Insurance Buyback Agreement as an actual and constructive fraudulent transfer. Id. at ¶ 13; Settlement Stipulation § 1(e).

The Trustee notified the Insurers of his intent to bring suit on the avoidance claims. Mot. to Approve at ¶ 14. The insurers denied the merit of the avoidance claims. Id. at ¶ 15. The Trustee turned to mediation after concerns of: (1) whether the value of the Policies was reasonably equivalent to their actual value; (2) obtaining a judgment may provide no cash value for the Estate; (3) and the cost of litigation. Id. at ¶ 16.

The Trustee and Insurers agreed to attempt mediation utilizing Attorney Richard Mikels as the mediator (the "Mediator"). Id. at ¶ 17. On March 31, 2023, the Bankruptcy Court authorized the employment and retention of the Mediator. Id., citing ECF No. 217 BR.

The parties engaged in many sessions with the Mediator and, on the last formal session in November 2024, the parties reached material terms of a settlement. Mot. to Approve at ¶ 19.

After the filing of the Motion to Approve the Approve, the Settlement Agreement was objected to on procedural grounds regarding the Insurance Buyback Agreement. See Denver Objection (Doc. No. 39); UST Objection (Doc. No. 30). However, the Trustee reported that both parties were provided with an opportunity to review a copy of the Insurance Buyback Agreement. Trustee Reply at 1. The Trustee then entered into a modification of the Settlement Stipulation ("Amended Settlement Stipulation") (Doc. No. 43) with the Insurers, to (1) eliminate assumption of any portion of the Insurance Buyback Agreement, and (2) clarify the sale of the Policies under the Settlement Stipulation, which supersedes all provisions of the original Insurance Buyback Agreement. Trustee Reply at 2, n. 3.

Following the Amended Settlement Stipulation, neither Denver nor the UST objected on grounds of failure to disclose. Trustee Reply at 2. The attorneys for both parties clarified during a hearing on June 16, 2025, that, upon the filing of the Amended Stipulation and Amended Proposed Order, the majority of the objections were resolved.[2] Hearing Transcript on June 16, 2025, at 7,13 ("Tr.") (Doc. No. 63).

Denver objects to the relief that the Trustee and Insurers seek from the court as part of the settlement. Denver Objection at 3. Specifically, Denver objects to a release of an injunction against third party claims, arguing it is "improper." Id. at 4.

---

[2] Baring Denver's substantive Purdue objection. See, infra Part IV. C.

7

The Trustee asserts that, Denver's objections are irrelevant, and the Bankruptcy Code provides a legal basis for the sale of the property. See, e.g., "Purdue is irrelevant to the Settlement . . . section 363 of the Bankruptcy Code confers on the Trustee the authority to sell estate property." Trustee Reply at 2-3.

### III.    LEGAL STANDARD

"Compromises are favored in bankruptcy" (10 Collier on Bankruptcy ¶ 9019.01 (16th ed. rev. 2019)), because compromises "help clear a path for the efficient administration of the bankrupt estate." See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 455 (2d Cir. 2007). A court must determine whether a settlement is fair, equitable, and in the best interest of the Estate. Id.; see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–25 (1968); Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y.1993), aff'd, 17 F.3d 600 (2d Cir.1994).

Rule 9019(a) of the Bankruptcy Rules governs the approval of compromises and settlements and provides as follows: on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct. Fed. R. Bankr. P. 9019(a). "[S]ettlements or compromises are favored in bankruptcy and, in fact, encouraged." In re Chemtura Corp., 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010). The Supreme Court held that to determine that a settlement is in the best interest of the Estate, the settlement must be "fair and equitable". Id. at 593, citing Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968).

The Second Circuit has promulgated the <u>Iridium</u> standards to evaluate if a settlement is fair and equitable, including factors such as:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

<u>In re Iridium Operating LLC</u>, 478 F.3d 452, 462 (2d Cir. 2007).

Section 363(f) of the Bankruptcy Code permits a debtor to sell property, under section 363(b) or (c), free and clear of any interest in such property of an entity other than the Estate in certain circumstances. 11 U.S.C. § 363(f). Specifically, section 363(f) provides the following:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Section 363(f) of the Bankruptcy Code is drafted in the disjunctive: approval of a proposed sale of assets free and clear of interests requires only that one of the five requirements be satisfied with respect to each such interest. See <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive,

authorizing a trustee or debtor-in-possession to sell property of the Estate free and clear of all liens "if any of the five conditions of § 363(f) are met . . . ").

### IV. DISCUSSION

#### A. The Amended Settlement Stipulation is Fair and Equitable, and in the Best Interest of the Estate

All of the Iridium factors in this case weigh in favor of approving the Amended Settlement Stipulation as it is beneficial to all parties as well as fair and equitable.

First, the Amended Settlement Stipulation is in the best interest of the Estate and all other parties when balancing the cost of litigation. The main benefit is the payment of the $9 million, and the Insurer's commitment to use reasonable efforts to settle claims against the Insurers and the Estate for legal services. Mot. to Approve at ¶¶ 26-27. This will increase the distribution of money to creditors for personal injury claims from the asbestos. Any litigation would only decrease the potential payout for creditors as the outcome of any litigation is uncertain and the cost of litigation would be high. Mot. to Approve at ¶ 28.

Second, the Amended Settlement Stipulation avoids protracted and complex litigation. The Estate and Insurers have already incurred substantial costs. Mot. to Approve at ¶ 29. Litigation would be expensive and resolving the complex factual determinations involved in the valuation of the Policies would lead to substantial delay and be challenging. Id.

Third, the Amended Settlement Stipulation is in the best interest of the creditors. Claims made against the Estate are primarily from highly sick individuals, who would soon benefit from the settlement money. Mot. to Approve at ¶ 30. The Estate had no

money to pay creditors at the beginning of the Chapter 7 proceedings, yet the Estate under this Amended Settlement Stipulation will have a substantial sum to utilize.  Id.

Fourth, there is support from other parties.  Throughout the Chapter 7 proceedings, the Trustee communicated with holders of the injury claims.  Mot. to Approve at ¶ 31.  The Amended Settlement Stipulation has been thoroughly discussed with counsel representing a significant number of these claims.  Id.  The only remaining Objection is filed by Denver.

Fifth, the counsel in this case are competent and experienced.  The Trustee and Insurers have been represented by counsel who are thoroughly versed in Bankruptcy law and the complex workings of insurance coverage.  Mot. to Approve at ¶ 32.

Sixth, the nature and breadth of the releases are customary.  In exchange for paying a sum of $9 million to the Estate and attempting to settle other claims, the Insurers receive a broad release backed by an injunction against the pursuit of all claims resolved in the Amended Settlement Stipulation.  Mot. to Approve at ¶ 33.  These protections are reasonable and customary in light of the consideration provided.

Seventh, there was sufficient arm's length bargaining.  The settlement process involved months with a mediator, who was approved by the Bankruptcy Court.  Mot. to Approve at ¶ 34.

Thus, all these factors taken together weigh in favor of the approval of the Amended Settlement Stipulation.  The Amended Settlement Stipulation is in the best interest of the creditors and the Estate.  The Amended Settlement Stipulation is both fair and equitable.  The Amended Settlement Stipulation is above the lowest point of

reasonableness as required by Bankruptcy law. Thus, the Amended Settlement Stipulation is beneficial to all parties involved.

### B. Arguments Challenging the Trustee's Assumption of the Insurance Buyback Agreement are Moot

The UST and Denver objected to certain provisions in the Amended Settlement Stipulation on grounds of nondisclosure. See Denver Objection at 5, UST Objection at 8-10. However, the Trustee reports that this procedural irregularity has been clarified with the striking of the assumption of the Insurance Buyback Agreement and the further clarification of the sale of the Policies pursuant to the Amended Settlement Stipulation. Trustee Reply at 1,4. Parties had the opportunity in court to further clarify that any and all objections to this specific matter were resolved. Tr. at 7. The UST and Denver counsel determined that their objections were resolved by the most recent changes. Tr. at 7,13. Thus, this court deems the objection moot.

### C. Gardner Denver, LLP's Objections

The Denver Objection makes, in essence, two arguments: (1) that Denver has a property interest in the insurance Policies and (2) that section 363 does not allow for that interest to be released. Denver Objection at 5-7. Denver is incorrect on both counts.

#### 1. Gardner Denver Does Not Possess a Property Interest in the Insurance Policies

Denver must demonstrate it has a property interest in the Policies. In re Reilly, 245 B.R. 768, 774 (B.A.P. 2d Cir.), aff'd, 242 F.3d 367 (2d Cir. 2000) (the claimant bears the ultimate burden of establishing the validity of its interest). Denver fails in its burden. Denver neither claims to be named as an insured under the Policies, nor has it produced any documentation showing it holds transfer of rights to said Policies.

The court provided Denver an opportunity at oral argument to address the relationship between Nash and Denver. Tr. at 10. Counsel for Denver explicitly relied on Purdue Pharma for his objection. Id. at 11,13. When the court questioned counsel about Nash's indemnification obligation to Denver, asking what kind of claims were involved given that Denver only purchased some of the assets, counsel acknowledged that this was a problematic and unclear issue. Id. at 15. Denver's counsel provided only a vague description of the assets transferred.[3] Id. at 16. Further questioning by the court regarding bare details of the agreement left Denver's counsel without anything to offer to support their argument. Id. at 18-19.

Denver's only support was the legally unsupported statement "insurance coverage follows underlying claims." Denver Objection at 7, Tr. at 22. This statement had no case law cited. Tr. at 22-23. In essence, Denver relies only on Purdue, which would support its second argument if it has any interest in the Policies that are the subject of the Amended Settlement Stipulation. However, Denver made no record that it has an interest in the Policies.

The crux of the problem is that Denver has not put forth any evidence or law to support its argument that Denver has rights to the Policies. Upon inquiry, counsel for the Trustee disputed that Denver even had an interest in the policies, stating the original sale did not specify "whether or not insurance policies were included…or excluded assets." Tr. at 29-30.

---

[3] Specifically, Denver's counsel said: "[T]hey bought assets that were related to another company, actually out of Germany, but they had originally had some of the Gardner Denver assets. But they're specifically assets unrelated to any of the assets that now have been claimed to have been causing mesothelioma and any other asbestos-related injuries. So any of those assets that are carved out were other assets purchased by Gardner Denver." Tr. at 16-17.

To determine a property interest, this court turns to state law. Colon de Mejias v. Lamont, 963 F.3d 196, 205 (2d Cir. 2020). Under Connecticut law, a property interest requires a legitimate claim of entitlement such as: (1) the right to use property; (2) the right to earn income from the property and the contract over its terms with other individuals; and (3) the right to dispose of, or transfer, ownership rights permanently to another party. A. Gallo & Co. v. Comm'r of Envtl. Prot., 309 Conn. 810, 838, (2013). Denver has come forward with no evidence to meet its burden of showing it has a property interest in the Policies. Thus, the Objection to the Motion to Approve is overruled on this ground.

> 2. Even if Denver had a Property Interest, the Court has Authority to Release the Claims Under Rule 9019 or Under Section 363(f) of the Code

Even if Denver had a property interest in the Policies, there are two separate bases upon which the Objection would be overruled on: (1) Rule 9019 and related case law; and (2) section 363 of the Bankruptcy Code. Denver asserts that Purdue prevents either the Rule 9019 or section 363 transfer; however, Denver misstates the law.

In Purdue, the Supreme Court was careful to differentiate between releases of claims that belonged to Purdue LLP, and those that did not. Harrington v. Purdue Pharma L. P., 603 U.S. 204, at 206 (2024). The majority, directly addressing the dissent's concerns, points out that:

> The dissent neglects why a bankruptcy court may resolve derivative claims. . . [i]t may because those claims belong to the debtor's estate. . . no one questions that Purdue may address in its own bankruptcy plan claims ""wherever located and by whomever held," § 541(a) — including those claims derivatively asserted by another on its behalf, See § 1123(b)(3). The problem is, the Sackler discharge is nothing like that. Rather than seek to resolve claims that substantively belong to Purdue, it seeks to extinguish claims against the Sacklers that belong to their victims. And precisely nothing in § 1123(b) suggests those claims can be

14

> bargained away without the consent of those affected, as if the claims were somehow Purdue's own property."

Id. at 219-20 (2024) (emphasis in original).  The key holding in Purdue is that a settlement may be approved, where the release of claims and injunctions are the property of the Bankruptcy Estate.  Here, the claims and injunctions are property of the Estate.

            a.       Rule 9019 of the Bankruptcy Code

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that a court may approve a compromise or settlement with notice given to creditors, debtors, the U.S. Trustee, indenture trustees, and any other entity the court designates.  Statutory authority under both the federal fraudulent transfer avoidance power of section 548 and state fraudulent transfer power of section 544 provides the sole and exclusive power to assert fraudulent transfer claims.  See 11 U.S.C. § 548, 11 U.S.C. § 544.

This power of the Trustee is backed by case law.  If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the Trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the Trustee's action.  St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701 (2d Cir. 1989).  A typical fraudulent transfer claim is a "paradigmatic example of a claim that is 'general' to all creditors . . . in bankruptcy such a claim is usually brought by the trustee, for the benefit of the creditors.  This is because the claim is really seeking to recovery property of the estate."  In re Bernard L. Madoff Inv. Sec. LLC., 740 F.3d 81, 91 (2d Cir. 2014), citing Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.), 522 F.3d 575, 589 n. 9 (5th Cir. 2008).  Broad releases stopping any attempts by a third party to assert the

15

released claims are allowed in settlements of claims against the Estate. See In re Tronox Inc., 855 F.3d 84, 89 (2d Cir. 2017) (enforcing injunction in settlement of fraudulent transfer claims to bar all claims of tort claimants against successor to debtor). Indeed, as in Purdue, the debtors Estate could address its bankruptcy claims without third party consent. Purdue, 603 U.S at 219-20.

Therefore, under broad statutory authority and settled case law, the Trustee has the power to act in entering the Amended Settlement Stipulation.

b. Section 363 of the Bankruptcy Code

i. Section 363(f) Allows Sales After Purdue

Section 363(f) expressly authorizes the sale of Estate property "free and clear of any interest in such property of an entity other than the estate." 11 U.S.C. § 363. The Policies and the Estate's rights and interests in those Policies are property of the Estate and, thus, may be sold by the Trustee pursuant to section 363.

The standard for approving a bankruptcy sale is whether there is an articulable business justification. In re Lionel Corp., 722 F.2d 1063, 1066 (2d Cir. 1983). Deference is applied to a review of a trustee's exercise of the power to sell assets. In re Borders Grp., Inc., 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011), citing In re Chateaugay Corp., 973 F.2d 141, 144–45 (2d Cir.1992). This Amended Settlement Stipulation meets the Iridium standard, and thus, there is ample justification for confirming the sale. See, supra, Part IV.A.

Bankruptcy courts have allowed section 363(f) injunctions following Purdue. A settlement, release, and buyback agreement were approved over the objection of other parties. See, e.g., In re Roman Catholic Diocese of Rockville Centre, 665 B.R. 71 (Bankr. S.D.N.Y. 2024) (despite US Trustee asserting that release and injunction

16

provisions conflicted with Purdue, the court ruled that settlement and buyback of insurance policies satisfied all requirements of section 363).

In this case, the criteria of 363(b) have been satisfied. The sale of the Policies will result in the payment of $9 million. This settlement was the result of mediation conducted in good faith and at arm's length. The funds will be available for creditors awaiting compensation. Finally, this resolves a potentially highly expensive and lengthy litigation.

In Purdue, the Supreme Court did not issue a sweeping change. Instead, the Court cautioned that the decision is "narrow" and answers only "the question presented." Purdue, 603 U.S at 206-07. The Supreme Court did not prohibit all third party releases and injunctions. Id. at 222. Section 363(f) expressly allows the sale of estate property free and clear of third-party claims.

Here, Denver has not demonstrated any interest in these Policies. See, supra, Part IV.C.1. Denver has not claimed to be an insured of the Policies, nor has it produced anything showing Denver was transferred any rights in the Policies. Id. Additionally, Nash disposed of the policies before the bankruptcy. See, supra, Part II. The Trustee has rights in the Policies only because of the fraudulent transfer powers of bankruptcy law. See, supra, Part III.

      ii. Even if Purdue Applied, Denver Did Not Object and Therefore Denver Consented

Courts may approve consensual releases of third-party claims. 11 U.S.C § 363(f)(2). Even if Purdue did apply, the Supreme Court held that the new ruling did not apply to consensual third-party releases. Purdue, 603 U.S at 207. Section 363(f)(2) authorizes the free and clear sale of assets if the entity claiming an interest in asset

17

consents. 11 U.S.C. § 363(f)(2). A party's failure to bring a timely objection will be deemed consent. In re Roman Catholic Diocese of Rockville Ctr., 665 B.R. 71, 86 (Bankr. S.D.N.Y. 2024) (a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear). Here, the Trustee served notice and publicized its intentions. (Doc. No. 28-31). Statements of support for the settlement were filed on behalf of the 1,154 claimants. (Doc. No. 32). There were no objections from creditors. Denver is not a creditor. See, supra, Part IV.C.1. Denver has not provided a basis for a claim against the Estate. Id. Therefore, all creditors have consented through lack of objection. Denver is not a creditor. Denver did not properly establish a claim, therefore it did not properly object. Therefore, Denver's consent is not required.

\*                                  \*                                  \*

In summation, section 363 allows the sale of these Policies under Purdue; and Purdue does not provide a basis for Denver's Objection. Therefore, regardless of any Purdue argument, the Motion to Approve is valid and is approved.

### V.     CONCLUSION

For the reasons stated above, the court adopts the Motion to Approve incorporating the Amended Settlement Stipulation and the Revised Proposed Order. The court overrules Denver's Objection.

In sum, Purdue does not provide a basis for Denver's Objection. Further, Rule 9019 of the Bankruptcy Code and section 363(f)(2) permit the sale of the Policies under the Amended Stipulation.

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of September 2025.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge